UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

| | |
|---|---|
| NATIONAL PRODUCTS INC., | CASE NO. 2:25-cv-00666-DGE |
| Plaintiff, | ORDER ON MOTION TO DISMISS FOR IMPROPER VENUE (DKT. NO. 22) |
| v. | |
| PIONEER SQUARE BRANDS INC., | |
| Defendant. | |

**I    INTRODUCTION**

This matter comes before the Court on Defendant Pioneer Square Brands Inc.'s ("PSB") motion to dismiss for improper venue under Federal Rule of Civil Procedure 12(b)(3). (Dkt. No. 22.) Plaintiff National Products Inc. ("NPI") opposes this motion. (Dkt. No. 54.) For the reasons that follow, the Court GRANTS Defendant's motion and ORDERS the Parties to provide supplemental briefing on where this case should be transferred.

ORDER ON MOTION TO DISMISS FOR IMPROPER VENUE (DKT. NO. 22) - 1

## II    BACKGROUND

This is a patent infringement case. Plaintiff is a corporation organized and existing under the laws of the state of Washington, with its principal place of business in Seattle. (Dkt. No. 19 at 1.) Plaintiff alleges on information and belief that Defendant is a corporation organized and existing under the laws of Delaware, with its principal place of business in North Carolina, though adds it has a "regular and established place of business within this judicial district" and holds itself out as a "'Seattle-based company.'" (*Id.* at 2, 3.) Plaintiff alleges it holds three patents (the '511 patent, the '142 patent, and the '550 patent) that Defendant, doing business as Vault (a technology accessory brand), is infringing on by selling its own products that incorporate the patents. (*See generally id.* at 3–26.) Plaintiff pleads that venue is proper in this district because Defendant "has committed acts of infringement in this District, and Defendant has a regular and established place of business in this District." (*Id.* at 3.)

Defendant filed a motion to dismiss for improper venue on July 9, 2025, arguing that it does not reside in nor have a regular and established place of business in the Western District of Washington, either of which is required to establish venue under 28 U.S.C. § 1400(b). (Dkt. No. 22 at 1.) On July 16, Plaintiff filed an unopposed motion for discovery related to the question of venue. (Dkt. No. 28.) This Court granted the motion and modified the briefing schedule to include a ten-week venue discovery period within limitations agreed to by the Parties. (Dkt. No. 29 at 1.) The Court also entered a stipulated protective order. (Dkt. No. 31.) On September 3, the Court held a discovery dispute hearing and made various rulings on issues that had arisen related to the scope and timeframe of various discovery requests (Dkt. No. 34), and venue discovery closed on October 2 (*see* Dkt. No. 29). Plaintiff filed its response to the motion to dismiss, and accompanying exhibits, under seal on October 16 (Dkt. Nos. 39, 40), along with an

unopposed motion to file under seal.[1]  Defendant filed its reply on October 30.  (Dkt. No. 44.)  The matter is now ripe for disposition.

To recap the facts relevant to this motion, Defendant is the "parent company" of the brands Brenthaven, Gumdrop, Vault, and TechShell, which provide "rugged mobile technology accessories."  (Dkt. No. 55-8 at 7; *see also* Dkt. No. 55-3.)  It was born in 2017, when Brenthaven, Defendant's predecessor company, acquired Gumdrop and a new holding company was formed that ultimately became Defendant.  (*See* Dkt. Nos. 55-1 at 21, 25–26; 55-5 at 13.)  Brenthaven was originally based in Bellingham, Washington (Dkt. No. 55-1 at 10) but moved to Seattle in 2008 or 2009 after being acquired by CKA Capital (*id.* at 16–17).  The name Pioneer Square Brands was chosen because at the time, its office was located in the Pioneer Square neighborhood of Seattle, but its founders believed the name was also "future proof" because "it seem[ed] like every city has a Pioneer Square."  (Dkt. No. 55-5 at 28.)

For most of its time in Seattle, Defendant's office was located at 321 Third Avenue South.  (Dkt. No. 23 at 2.)  It closed that office in February 2023, and it signed a one-year lease at 411 1st Avenue South in Seattle at the request of its design team.  (*Id.*; Dkt. No. 55-8 at 45.)  That lease ended January 31, 2024, and Defendant states "it has not had an office in Seattle or elsewhere in Washington" since, though the company "usually" holds a board meeting in Seattle once a year.  (Dkt. Nos. 23 at 2; 55-5 at 20; 55-8 at 12.)

---

[1] The motion to file under seal was filed pursuant to the terms of the stipulated protective order and concerned Plaintiff's use of Defendant's allegedly confidential information in its opposition to the motion to dismiss.  (*See* Dkt. No. 37.)  The Court ordered Defendant to show cause as to why the information contained in Plaintiff's opposition brief and exhibits should be maintained under seal.  (Dkt. No. 43.)  The Court considered Defendant's reasons for sealing and the supporting documentation (*see* Dkt. Nos. 46, 47) and made various rulings on the motion to seal (Dkt. No 53).  Plaintiff filed new redacted versions of its opposition brief and supporting declaration following the Court's order.  (*See* Dkt. Nos. 54, 55.)  The updated redacted versions are cited to in this order.

ORDER ON MOTION TO DISMISS FOR IMPROPER VENUE (DKT. NO. 22) - 3

When Defendant acquired Vault in 2023, it also relocated its headquarters to High Point, North Carolina.  (Dkt. Nos. 23 at 2; 55-8 at 51.)  Initially, "everything was done" at its new headquarters at 1515 West Green Drive, but soon the company "needed additional space," so it found a warehouse located at 721 Thomasville Road.  (Dkt. No. 55-5 at 22.)  The workforce was at first split between office and warehouse, but the team was ultimately combined into one space at the Thomasville Road location, where the company resides today.  (*Id.*)  There are about fifteen employees that work at the North Carolina facility.  (*Id.* at 29.)  None of Defendant's Seattle-based employees moved to North Carolina when the company headquarters relocated.  (Dkt. No. 55-8 at 60.)

Defendant is run primarily by CEO Michael Ferren and CFO Marc Matsumura.  (Dkt. No. 55-5 at 8.)  Scott Armstrong has been with Defendant the longest; he joined Brenthaven in 2005 and "transitioned to the role of President and CEO" in 2007.  (Dkt. No. 55-1 at 9, 13.)  He became Defendant's Executive Chairman in 2022 and is now involved with the company "on average four hours a week," "provid[ing] high-level strategic support to [Ferren] and [Matsumura]."  (Dkt. No. 55-1 at 35–36.)  All three have been involved with the company for nearly two decades.  (Dkt. Nos. 55-5 at 12; 55-8 at 20–21).  Armstrong lives in Seattle (Dkt. No. 55-1 at 36–37); Ferren lives in Camas (in the southwest corner of the state near Portland, Oregon) (Dkt. No. 55-5 at 16); and Matsumura lives in Spanaway (south of Tacoma) (Dkt. No. 55-8 at 5).  All three conduct their business for Defendant from their home offices in the Western District of Washington.  (Dkt Nos. 55-1 at 37; 55-5 at 18–20; 55-8 at 39–40.)

ORDER ON MOTION TO DISMISS FOR IMPROPER VENUE (DKT. NO. 22) - 4

## III    DISCUSSION

### A. Legal Standards

A party may move to dismiss an action for improper venue under Federal Rule of Civil Procedure 12(b)(3).  If venue is improper, the district court must either dismiss the case or, if in the interest of justice, "transfer such case to any district or division in which it could have been brought."  28 U.S.C. § 1406(a).  The plaintiff bears the burden of showing venue is proper.  *Piedmont Label Co. v. Sun Garden Packing Co.*, 598 F.2d 491, 496 (9th Cir. 1979).

The patent venue statute, 28 U.S.C. § 1400(b), provides that "[a]ny civil action for patent infringement may be brought in the judicial district where the defendant resides, or where the defendant has committed acts of infringement and has a regular and established place of business."  *TC Heartland LLC v. Kraft Food Grp. Brands LLC*, 581 U.S. 258, 261 (2017).  A corporation "resides" only in its state of incorporation for purposes of the statute.  *Id.* at 262.  For the second basis for venue, there are three "general requirements": (1) a "physical place in the district"; (2) which must be a "regular and established place of business"; and (3) it must be the "place of the defendant."  *In re Cray*, 871 F.3d 1355, 1360 (Fed. Cir. 2017).  If any one of the requirements is not satisfied, venue is improper under § 1400(b).  *Id.*

### B. The Parties' Arguments[2]

Defendant argues it does not have a "regular and established" place of business in this district, because it closed its Seattle office in 2023, "well before [Plaintiff] filed its original

---

[2] The Parties do not dispute that Defendant is incorporated in Delaware and therefore venue is not supported in this district under the first basis of § 1400(b). (*See* Dkt. Nos. 19 at 2; 22 at 4; 54 at 17 n.7.)  Defendant denies it committed acts of infringement here or elsewhere but states its motion "only focuses on [Plaintiff]'s failure to show that [Defendant] has a regular and established place of business in this District."  (Dkt. No. 22 at 4 n.2.)  Plaintiff's characterization of this position is that Defendant "does not contest for purposes of its Motion that it has committed allegedly infringing acts in this district."  (Dkt. No. 54 at 17 n.7.)  Regardless, the

ORDER ON MOTION TO DISMISS FOR IMPROPER VENUE (DKT. NO. 22) - 5

complaint." (Dkt. No. 22 at 4.)  It asserts that whether it is "based" in Seattle or whether it is registered with the Washington Secretary of State has no bearing on the venue analysis.  (*Id.* at 5.)  The thrust of Defendant's motion focuses on the six employees who work remotely for Defendant from their private residences in the Seattle area.  (*Id.* at 6.)  Defendant argues the private residences of these employees do not meet the requirements as outlined in *Cray*, and therefore, venue is not proper in the Western District of Washington.  (*Id.*)  This is because, according to Defendant, the employees' homes do not function as distribution or sales centers, nor does Defendant require them to maintain homes in Washington or exert other means of control over their private residences.  (*Id.* at 6–9.)

In response, Plaintiff asserts *Cray* does not control and argues that Defendant's "nerve center" is in this district, because three of Defendant's top executives—Armstrong, Ferren, and Matsumura—direct and control the company from their homes in western Washington.  (Dkt. No. 54 at 20–22.)  Plaintiff further asserts that even if *Cray* is applied, it points in the same direction: that Defendant's principal place of business is in the Western District of Washington, with only "limited, low-level operations elsewhere."  (*Id.* at 22–24.)  Plaintiff also argues Defendant waived its right to challenge venue by means of a forum selection clause found on Defendant's website, which maintains that any legal action related to the website may only be brought in either Washington state court or the Western District of Washington.  (*Id.* at 26–28.)  Plaintiff argues that because the case arises out of Defendant's infringement performed in part

Court emphasizes venue is proper under the second basis of *Cray* only if *both* the acts of infringement *and* regular and established place of business prongs are met.  *See Cray*, 871 F.3d at 261.  Because the Parties do not brief the issue, the Court will analyze only whether Defendant has a regular and established place of business in the Western District of Washington but notes that the record does not address where the allegedly infringing acts occurred.

through its website, the terms and conditions of the website, including the forum selection clause, apply to this dispute. (*Id.* at 26–27.)

In its reply, Defendant refutes Plaintiff's use of the "nerve center" test and reiterates that the patent venue test laid out in *TC Heartland* and *Cray* controls. (Dkt. No. 44 at 5–8.) It further argues the forum selection clause found on its website governs only the relationship between Defendant and its website users and Plaintiff's patent infringement claim falls outside the scope of the clause. (*Id.* at 13–14.)

**C. Analysis**

**1. Waiver of Venue Challenge via Forum Selection Clause**

The "contractual designation of a particular forum for the resolution of disputes is presumptively valid and should be enforced." *Cung Le v. Zuffa, LLC*, 108 F. Supp. 3d 768, 774 (N.D. Cal. 2015). Like any other contractual agreement, courts must try to effectuate the parties' intent when interpreting a forum selection clause. *See Calisher & Assocs., Inc v. RGCMC, LLC*, Nos. CV08–06523–MMM (Ex), CV08–06540–MMM (Ex), 2008 WL 4949041, at *3 (C.D. Cal. Nov. 17, 2008) (citation omitted). Relevant here, a forum selection clause can "operate as a waiver of § 1400(b) because it shows the parties consented to litigate in a particular forum." *Sundesa, LLC v. IQ Formulations, LLC*, Case No. 2:19-cv-06467-AB-MAA, 2020 WL 8125541, at *2 (C.D. Cal. Aug. 19, 2020).

In support of its argument that Defendant has waived its right to challenge venue in this district, Plaintiff cites to *Sundesa,* where the parties reached a settlement agreement (itself a type of contract) that included a forum selection clause agreeing to litigate future disputes related to the agreement in the Central District of California. (*See* Dkt. No. 54 at 27.) Then, when the defendant moved to dismiss a new infringement suit arising out of the settlement agreement, the

court denied the motion because the defendant had failed to meet its burden of showing the forum selection clause was unenforceable. *Sundesa*, 2020 WL 8125541, at *3–4. Plaintiff here stretches that reasoning to reach the conclusion that because Defendant is "perform[ing]" infringing activities through its website—i.e., "advertising, selling, and offering support for the infringing products"—it is therefore subject to the forum selection clause included in the terms of service on its website. (Dkt. No. 54 at 27.) But Plaintiff provides no factual support for its argument that the forum selection clause on Defendant's website, which appears to apply to buyers of Defendant's products (*see* Dkt. No. 55-32), also applies to Plaintiff, nor does Plaintiff provide any facts that give rise to the inference that Plaintiff and Defendant are in a contractual relationship of some kind. "A contract cannot be validly formed without mutual assent from the parties involved." *Acclarent, Inc. v. Quest Med., Inc.*, No. C 06-00844 JF, 2006 WL 2982301, at *3 (N.D. Cal. Oct. 17, 2006) (citing *Rennick v. O.P.T.I.O.N. Care, Inc.*, 77 F.3d 309, 315 (9th Cir. 1996)). Neither does Plaintiff provide evidence that the instant dispute related to Defendant's alleged infringement arises out of the forum selection clause generally available on Defendant's website. *See Apple Inc. v. Telefonaktiebolaget LM Ericsson, Inc.*, Case No. 15–cv–00154–JD, 2015 WL 1802467, at *3 (N.D. Cal. Apr. 20, 2015) ("this action does not fall within the scope of the forum selection clause . . . because it cannot be said to 'arise under or in connection with' that agreement"); *accord. Kannuu Pty Ltd. v. Samsung Elecs. Co., Ltd.*, 15 F.4th 1101, 1107–1108 (Fed. Cir. 2021) (determining that the "issues underlying patent infringement" fall outside the scope of the parties' NDA, which included a forum selection clause). The Court concludes the forum selection clause on Defendant's website does not encompass this dispute and therefore Defendant has not waived its right to challenge venue in this district.

### 2. Venue Under 28 U.S.C. § 1400(b)

*Cray* instructs there are three "general requirements" to determine whether venue is appropriate in a judicial district: (1) a "physical place in the district"; (2) which must be a "regular and established place of business"; and (3) it must be the "place of the defendant." 871 F.3d at 1360. Each case "depends on its own facts" and "no one fact is controlling." *Id.* at 1362, 1366. If any one of these requirements is not satisfied, venue is improper under § 1400(b). *Id.* at 1360.

The patent venue inquiry is "specific and unambiguous" and should be narrowly construed. *Id.* at 1361 (citation omitted). The Federal Circuit instructs that courts should be "careful not to conflate showings that may be sufficient for other purposes," such as personal jurisdiction or the general venue statute, "with the necessary showing to establish proper venue in patent cases." *Id.* Importantly, "the regular and established place of business standard requires more than the minimum contacts necessary for establishing personal jurisdiction or for satisfying the doing business standard of the general venue provision[.]"[3] *Id.* (citation omitted). The Court agrees with Plaintiff to some extent that the current situation before it, in which Defendant argues "that the district where all of its executives live and work is an improper venue under § 1400(b)," does not neatly fit into the *Cray* framework. (Dkt. No. 54 at 20.) But the Court is constrained by the strong language in *Cray*, which "clearly requires that venue be laid where 'the defendant has a regular and established place of business,' not where the defendant's employee owns a home in which he carries on some of the work that he does for the defendant." *Cray*, 871 F.3d at 1365 (citation omitted). In fact, *Cray* specifically rejected the district court's

---

[3] The Court accordingly declines to apply the diversity jurisdiction "nerve center" test from *Hertz Corp. v. Friend*, 559 U.S. 77 (2010), as requested by Plaintiff. (*See* Dkt. No. 54 at 20–22.)

attempt to fashion a four-factor inquiry that was meant to evaluate "a regular and established place[] of business 'in the modern era,' including physical presence, defendant's representations, benefits received, and targeted interactions with the district." *Id.* at 1358, 1362 ("The district court's four-factor test is not sufficiently tethered to this statutory language and thus fails to inform each of the necessary requirements of the statute."). Because "the analysis must be closely tied to the language of the statute," *id.* at 1362, the Court concludes under the *Cray* test that venue is improper in the Western District of Washington.

### a.  Physical Place in the District

The first consideration is whether Defendant has a "physical, geographical location in the district from which the business of the defendant is carried out." *Id.* at 1362. It need not be a "fixed physical presence in the sense of a formal office or store," but it must be more than a "virtual space" or "electronic communications from one person to another." *Id.* (citation omitted). Home offices may constitute a physical place of business in certain circumstances. *See RegenLab USA LLC v. Estar Techs. Ltd.*, 335 F. Supp. 3d 526, 549 (S.D.N.Y. 2018) (holding that the home offices of employees are a physical place in the district because all the company's employees work from home); *Evergreen Telemetry LLC v. Fieldpiece Instruments Inc.*, 793 F. Supp. 3d 1085, 1090 (D. Ariz. 2025) (holding the physical place requirement is met when the defendant stored products at its employees' homes to fulfill their job duties across the district). *But see Clark v. DocuSign, Inc.*, No. 21-cv-1007 (DLF), 2022 WL 16985185, at *2 (D.D.C. Nov. 15, 2022) (citation omitted) (holding that the employees' home offices did not constitute a physical place in the district because the defendant did not store materials or perform demonstrations, evaluations, trainings, or presentations from their homes).

ORDER ON MOTION TO DISMISS FOR IMPROPER VENUE (DKT. NO. 22) - 10

Here, Defendant argues the first element is not met because it does not require its employees to work at home, nor does it store inventory or provide secretarial services at the homes of its remote employees.  (Dkt. No. 22 at 7.)  Plaintiff states the home offices of Armstrong, Ferren, and Matsumura constitute "physical place[s] in the district" because they indisputably conduct business for Defendant from their home offices and they are required to maintain a separate workspace in their homes.  (Dkt. No. 54 at 22.)  The Court agrees with Plaintiff.

Though not all of Defendant's employee's work from home, those that make high-level, managerial decision for the company do (and apparently always have).  The Federal Circuit has noted that a "small business might operate from a home," in which case the home would satisfy the "physical place in the district" requirement.  *Cray*, 871 F.3d at 1363.  Here, there are just two individuals running the company: Ferren, who fulfills the role of both CEO and COO (Dkt. No. 55-5 at 13–14); and Matsumura, the CFO, who reports only to Ferren (*id*. at 8).  Indeed, Ferren testified that he "steer[s] the company strategy" and everything at the company "rolls up" to him and Matsumura.  (Dkt. No. 55-5 at 7–8.)  Matsumura similarly testified that he and Ferren were the "ultimate decision-makers" for PSB Technology Services,[4] though there were "things [they] would have to go to the board about" for decisions about Defendant's operations as a whole. (Dkt. No. 55-8 at 17.)  There is no dispute that these activities took place primarily from Ferren and Mastumura's home offices.  (*See id.* at 39–40 (Matsumura explaining his "predominant work location in Washington State" is his home office in Spanaway); *see also* Dkt No. 55-5 at 18–20 (Ferren discussing his home office in Camas).)  Thus, similar to the employees in *RegenLab*,

---

[4] PSB Technology Services is a "subsidiary in the Philippines where [Defendant] run[s] back office and sales support."  (Dkt. No. 55-1 at 15.)

"home offices constitute a primary physical location for [Defendant's] business."  335 F. Supp. 3d at 549.  The first *Cray* element is met.

### b.  Regular and Established Place of Business

The second element includes two parts: that the place of business be both regular and established.  *Cray*, 871 F.3d at 1162.  A "place of business" is a "'location where, for example, products are made, customers are served, or business decisions are made.'"  *RegenLab*, 335 F. Supp. 3d at 550 (citation omitted).  The place of business cannot be "sporadic"; rather, it must operate in a "steady, uniform, orderly, and methodical manner."  *Cray*, 371 F.3d at 1162 (citations and alterations omitted).  There must be more than temporary business, such as for some special work or a particular transaction.  *Id.* (citation omitted).  As to the "established" requirement, the place must be "settled" or "fixed permanently."  *Id.* at 1163 (citation and alterations omitted).  While courts require some "sufficient permanence," a business can move its location, as long as it is then stable for a meaningful time.  *Id.* (citation omitted).  The Defendant must have a *place* of business that is regular and established, rather than "some unrelated business presence in the District."  *Clark*, 2022 WL 16985185, at *2.

Defendant argues that venue is not proper in this district because its remote employees "can move their homes out of the District without approval from [Defendant]," thus "defeat[ing] any notion the homes are stable and established places of business."[5]  (Dkt. No. 22 at 7.)  Plaintiff counters that Armstrong, Ferren, and Matsumura have been living in and working from their homes for many years, which is "more than enough time to make such places 'regular and

---

[5] Courts should consider the employee's obligation to live in a certain district when analyzing the third requirement.  *See Evergreen Telemetry*, 973 F. Supp. 3d at 1091.  The fact Defendant does not require its remote executives to relocate is not dispositive of the second factor but is discussed in Section III(C)(2)(c) *infra*.

established.'" (Dkt. No. 54 at 22–23) (citing *Cray*, 871 F.3d at 1363). The Court finds the home offices of the remote executives are regular and established places of business under *Cray*.

There is no doubt that the Western District of Washington is where Defendant's "business decisions are made," *see RegenLab*, 335 F. Supp. 3d at 550 (citation omitted), notwithstanding the headquarters' relocation to North Carolina. As discussed, Ferren and Matsumura oversee and direct much of Defendant's operations, and both, along with Armstrong, indisputably work from their home offices in the district. (*See* Dkt Nos. 55-1 at 37; 55-5 at 18–20; 55-8 at 39–40.) Put another way, the three remote executives do not work out of their homes in western Washington by "happenstance." *RegenLab*, 335 F. Supp. 3d at 550. The company started in the Seattle area as Brenthaven, with Armstrong and Ferren, who were "high school friends," running the company as CEO and VP of Operations respectively. (Dkt. No. 55-5 at 11.) They guided Brenthaven's development until Defendant as a formal entity was formed in 2017, and Ferren took over as CEO in 2021 or 2022. (*Id.* at 13.) Defendant's presence in the district is not "merely some unrelated business presence," *see Clark*, 2022 WL 16985185, at *2, but is part and parcel with the existence of the company in the first place.[6]

---

[6] The Court in *Clark* emphasized "that the *work* done by these employees in their homes [must be] 'fixed permanently' to the District." 2022 WL 16985185, at *2 (emphasis added) (citing *Cray*, 871 F.3d at 1363 (cleaned up)). There, the plaintiff failed to prove that the defendant's business "cannot freely be moved in and out of the district." *Id.* at *2. But here, though the remote executives can easily work from locations outside their home offices (*see* Dkt. Nos. 55-1 at 37; 55-5 at 14, 21), and Ferren and Matsumura both regularly work from the company headquarters in North Carolina for several days at a time (Dkt. Nos. 55-5 at 21; 55-8 at 62–63), the record also indicates this arrangement is nothing new. Put differently, the question of whether the *work* done by Defendant's remote employees is "fixed permanently" to the district is a non sequitur. This is because Defendant's business model appears to have functioned with mostly remote executives in Washington since the company's inception, making those executives' presence in Washington stable and established. *Clark*, 2022 WL 16985185, at *2.

ORDER ON MOTION TO DISMISS FOR IMPROPER VENUE (DKT. NO. 22) - 13

Defendant's business in the district is also not sporadic or transient. For example, Matsumura testified in a deposition that he worked from his former home in Renton (which he still owns) and his current home in Spanaway both before and during the COVID-19 pandemic—well before the 2023 relocation. (Dkt. No. 55-8 at 5, 32–35.) Ferren too has lived in Camas since he joined Brenthaven in 2007 and visited the office in Seattle consistently, though "there was really no regular schedule" for his visits. (Dkt. No. 55-5 at 16–17.) Courts have held that five years is a period of sufficient permanence to satisfy the second *Cray* element. *Marble VOIP Partners LLC v. RingCentral, Inc.*, W-22-CV-00259-ADA, 2023 WL 3938480, at *5 (W.D. Tex. June 9, 2023) (citing *Remington Rand Bus. Serv. v. Acme Card Sys. Co.*, 71 F.2d 628, 629 (4th Cir. 1934)). Defendant far exceeds that timeframe. Therefore, the second *Cray* element has been satisfied.

### c. Place of the Defendant

Finally, courts require that the regular and established place of business must be the "place *of the defendant*" and not "solely a place of the defendant's employee." *Cray*, 871 F.3d at 1163. In other words, the defendant must "establish or ratify" the place of business. *Id.* Relevant considerations include whether the defendant "owns or leases the place," "exercises other attributes of possession or control over the place," or whether the defendant "conditioned employment on an employee's continued residence in the district or the storing of materials at a place in the district." *Id.* Courts also look at the nature and activity of the place in comparison with the defendant's other places of business in other districts. *Id.* at 1364. A defendant's outward representations, such as advertising, that it has a place of business are relevant, but the defendant must still engage in business from the location for venue to be proper. *Id.* at 1163–1164.

ORDER ON MOTION TO DISMISS FOR IMPROPER VENUE (DKT. NO. 22) - 14

Here, Defendant states it does not exert control over the remote employees' residences sufficient to make their homes a "place of the defendant" and insists that the fact the remote employees are company executives does not alter the analysis. (Dkt. Nos. 22 at 8; 44 at 12.) Plaintiff argues the remote executives "oversee every aspect of the business" from this district and their high-level control distinguishes them from other remote employees in patent venue disputes. (Dkt. No. 54 at 23–24.) In support of this theory, Plaintiff provides a detailed history of the formation of Defendant in western Washington and how it came to be headquartered in North Carolina. (*See generally id.* at 8–17.)

The Court concludes that the home offices of the remote employees are not a "place of the defendant" sufficient to establish venue. *Cray*, 871 F.3d at 1163. Defendant does not condition employment on the remote employees maintaining their homes in this district. (Dkt. No. 23 at 2.) It does not hold itself out as having a place of business here. (*Id.* at 3.) Nor does it own, lease, or otherwise control the homes of the remote employees. (*Id.* at 2); *see also BillingNetwork Patent, Inc. v. Modernizing Med., Inc.*, No. 17 C 5636, 2017 WL 5146008, at *3 (N.D. Ill. Nov. 6, 2017) (five remote employees were insufficient to show venue because the defendant did not own, lease or financially contribute to their homes). And although Defendant provides technology and home office equipment to its remote employees (*see* Dkt. Nos. 55-5 at 19; 55-8 at 35), this alone is not enough to render their home offices a place of Defendant. *See C.R. Bard Inc. v. Smiths Med. ASD, Inc.*, Case No. 2:12-cv-00036-RJS-DAO, 2020 WL 6710425, at *9 (D. Utah Nov. 16, 2020) (discussing that "expenditures" such as cell phones and computers for employees are not "'intentional actions' directed at creating a regular and established place of business within a district") (citation omitted); *see also RegenLab*, 335 F. Supp. 3d at 552 (same). Further, Defendant's business does not "specifically depend[] on

employees being physically present" in this district, nor has it "affirmatively acted to make permanent operations" here to "service its customers." *Evergreen Telemetry*, 793 F. Supp. 3d at 1092 (citation omitted and cleaned up). If anything, the remote executives can conduct their business on Defendant's behalf from any number of locations. (*See* Dkt. No. 55-1 at 37) (Armstrong "sometimes" works from a second home in Leavenworth, Washington, and he "take[s] meetings from the road" if necessary); (Dkt. No. 55-5 at 14) (Ferren can take his biweekly board call "[d]epend[ing] on where I'm at."). Aside from a once-annual board meeting in Seattle, there are no other in-person meetings in Washington, and both Ferren and Matsumura regularly travel to North Carolina to interact with other employees of the company. (*See* Dkt. Nos. 55-5 at 21; 55-8 at 62–63.) Put another way, Defendant's remote employees "could continue to perform their employee duties if they lived elsewhere." (Dkt. No. 23 at 2.)

Plaintiff places much emphasis on Defendant's formation and its reasons for moving to North Carolina in 2023 to drive home its point that venue here is proper. (*See generally* Dkt. No. 54 at 8–17.) The Court does not find much of this background information pertinent; that the company was formerly based in this district and refers to itself as "[f]ounded in Seattle's historic Pioneer Square neighborhood" has no bearing on the fact that its operations have shifted elsewhere for the timeframe relevant to this case. (Dkt. Nos. 55-10 at 2; 55-11 at 2.) Likewise, outward representations on LinkedIn that the executives live in western Washington also do not establish venue. (*See* Dkt. Nos. 55-2 at 2; 55-7 at 2); *Medallia Inc. v. EchoSpan, Inc.*, Case No. 3:22-cv-1243-MMH-LLL, 2023 WL 5352312, at *6 (M.D. Fla. Aug. 21, 2023) (discussing the Federal Circuit's finding that evidence of employee business cards and LinkedIn profiles were "'too speculative' to support venue"). Even if the "only reason" Defendant moved its headquarters to High Point was to take advantage of business incentives (*see* Dkt. No. 54 at 7, 26

ORDER ON MOTION TO DISMISS FOR IMPROPER VENUE (DKT. NO. 22) - 16

n.12), the justification for Defendant's relocation is immaterial to the *Cray* analysis, which looks only to whether there was a regular and established place of business at the time the cause of action accrued.[7] *See Genetech, Inc. v. Eli Lilly & Co.*, Case No.: 18-cv-01518-JLS (JLB), 2019 WL 1923087, at *4 n.7 (S.D. Cal. Apr. 29, 2019) (citation omitted).

The factor that leans most heavily in Plaintiff's favor is the comparison between the nature and activity of these places with Defendant's other places of business in other districts—though the Federal Circuit has cautioned that district courts should not "scrutinize" this factor "to make relative value judgments on the different types of business activity conducted therein." *Cray*, 871 F.3d at 1364, n.*.  As discussed, this case is unique in that Armstrong, Ferren, and Matsumura are engaged in high-level, executive responsibilities from their homes in the Western District of Washington—distinct from many comparable cases in which the remote employees had lower-level roles.  *E.g.*, *Evergreen Telemetry*, 793 F. Supp. 3d at 1091 (sales representatives); *IOT Innovations LLC v. Monitronics Int'l, Inc.*, Civil Action No. 2:22-cv-0432-JRG-RSP, 2023 WL 6318049, at *2 (E.D. Tex. Sept. 11, 2023) (service technicians). Ultimately, however, the fact the remote employees are integral to Defendant's operations does not alter the controlling analysis.  *See C.R. Bard*, 2020 WL 6710425, at *10 (determining that an employee's work, while "more executive in nature . . . and therefore, more important to [the

---

[7] Plaintiff takes issue with "the ease at which [Defendant] change[d] its 'headquarters' location," which "shows that the decision can be readily reversed at any time based on the whims of its three executives." (Dkt. No. 54 at 26.)  According to Plaintiff, Defendant's claim that the "company operates from a North Carolina warehouse" makes venue improper here is akin to the "jurisdictional gamesmanship" warned against by the Supreme Court and Federal Circuit in other cases. (*Id.* at 25–26.)  But the Federal Circuit has also cautioned that "venue is not amenable to such policy concerns." *See Valeant Pharms. NA LLC v. Mylan Pharms. Inc.*, 978 F.3d 1374, 1383 (Fed. Cir. 2020) (citing *Cray*, 871 F.3d at 1361) (rejecting a policy argument that a company may "game" the system to avoid venue in certain jurisdictions under § 1400(b) and reinforcing that courts must give the patent statutes their "current plain meaning").  Plaintiff's venue manipulation argument is therefore unpersuasive.

ORDER ON MOTION TO DISMISS FOR IMPROPER VENUE (DKT. NO. 22) - 17

defendant]'s business[,]" did not change the analysis); *Medallia Inc.*, 2023 WL 5352312, at *1, 7 (comparing the homes of the defendant company's employees, including its president, who worked remotely from Florida to the home of the CEO in Georgia, which "is publicly represented to be a place of business of the Defendant").

Viewed as a whole, the record does not show that the homes of the remote employees in the Western District of Washington are regular and established places of business *of Defendant*. Plaintiff has not established the final requirement for patent venue under *Cray*.  Thus, venue in this district is improper.

> **d. *Cray* cannot be conflated with the "nerve center" test used to determine a corporation's citizenship for purposes of diversity jurisdiction.**

The Court acknowledges that Plaintiff makes what appears to be a logical argument: that the "*principal* place of business" language found in 28 U.S.C. § 1332(c)(1) is narrower than the "*regular and established* place of business" language in § 1400(b); therefore, a "corporation's principal place of business would easily qualify as a regular and established one."  (Dkt. No. 54 at 20 n.10.)  In fact, it seems likely that Defendant's "nerve center" would be in Washington if the question of diversity jurisdiction was before the Court.  The Federal Circuit has warned, however, that "[c]ourts should be mindful of [the history of § 1400(b)] in applying the statute and be careful not to conflate showings that may be sufficient for other purposes, *e.g.*, personal jurisdiction or the general venue statute[.]"  *Cray*, 871 F.3d at 1361.  Further, a district court's analysis must be "sufficiently tethered to [the] statutory language" and must "inform each of the necessary requirements of the statute."  *Id.* at 1362.  The Court's ability to consider Plaintiff's alternative theory is limited by this admonishment.

Plaintiff's argument in favor of applying the "nerve center" test would be all the more compelling if Armstrong, Ferren, and Matsumura were Defendant's only three remote employees. But deposition testimony revealed that Mitch Reed, who is the only other member of the Board of Directors alongside Armstrong, is not located in Washington State. (*See* Dkt. No. 55-8 at 10.) And aside from Matsumura, Ferren has three direct reports that hold other high-level positions, including James Finney in Tennessee (who "oversees all the product areas of the business"); Scott Devine in Wisconsin (who is the "leader of commercial designs"); and Maria Samples in Florida (who is "in charge of [Defendant's] education"). (Dkt. No. 55-5 at 8–9.) Though these employees may not exert the same level of control over the operations of Defendant as Ferren and Matsumura, the presence of other managerial employees in other districts in the country makes Defendant's "nerve center" in western Washington less clear-cut. In any case, the number of employees in Washington—or elsewhere—should not affect the analysis. *See Medallia Inc.*, 2023 WL 5352312, at *6 n.13 (explaining that the Federal Circuit has "expressed skepticism" of the "'aggregate place theory'") (citation omitted).

Post-*Cray*, the Federal Circuit has commented on the "great uncertainty among district courts and litigants" facing the issue of venue under § 1400(b), especially for companies that do not "'operate under a brick-and-mortar model.'" *In re Google LLC*, Case No. 2018-152, 2018 WL 5536478, at *4–5 (Fed. Cir. Oct. 29, 2018) (quoting *Cray*, 871 F.3d at 1359). That uncertainty is apparent in this case. But while Plaintiff raises legitimate arguments, it is beyond this Court to disregard *Cray*'s clear language and narrow construction. As *Cray* emphasized, "'[t]he requirement of venue is specific and unambiguous; it is not one of those vague principles which, in the interests of some overriding policy, is to be given liberal construction.'" *Cray*, 871 F.3d at 1361 (quoting *Schnell v. Peter Eckrich & Sons, Inc.*, 365 U.S. 260, 264 (1961)).

### 3. Dismissal or Transfer

Defendant seeks dismissal of the action under Federal Rule of Civil Procedure 12(b)(3). (Dkt. No. 22 at 4.)  Plaintiff opposes dismissal but does not request transfer of the case in the alternative.  (*See* Dkt. No. 54 at 28.)  Under 28 U.S.C. § 1406(a), "[t]he district court of a district in which is filed a case laying venue in the wrong division or district shall dismiss, or if it be in the interest of justice, transfer such case to any district or division in which it could have been brought."  Whether the interest of justice cuts in favor of transfer rather than dismissal "is a judgment committed to the sound discretion of the district court."  *Citizens for a Better Env't-Cal. v. Union Oil Co. of Cal.*, 861 F. Supp. 889, 898 (N.D. Cal. 1994).  Typically, transfer is preferred because "dismissal of an action that could have been brought elsewhere is time-consuming and justice-defeating."  *Miller v. Hambrick*, 905 F.2d 259, 262 (9th Cir. 1990) (citation omitted); *see also Amazon.com v. Cendant Corp.*, 404 F. Supp. 2d 1256, 1262 (W.D. Wash. 2005) (considering the interests of justice in transferring the case, which includes judicial economy).

Here, the Court finds that for purposes of judicial economy, the best route forward is to transfer the case to a proper venue.  The hitch is that neither party has briefed where venue would be proper in the event of transfer.  Defendant is incorporated in Delaware (*see* Dkt. Nos. 19 at 1; 22 at 4; 54 at 17 n.7) and as the Court has discussed, *appears* to have its regular and established place of business in High Point, North Carolina.  *See* Section III(C)(2) *supra*; *cf. Clark*, 2022 WL 16985185, at *4 (transferring case to the Northern District of California because the parties' briefing stated the defendant was headquartered and had its principal place of business there).  The issue of where Defendant has committed acts of infringement, if any, remains an open question.  *See* n.2 *supra*.  On the record as it stands, the Court could transfer the

case to the District of Delaware, where Defendant is incorporated, but it cannot say for certain whether venue is proper in the Middle District of North Carolina—or elsewhere—under *Cray*'s second basis for venue.

At least one district court has raised issue preclusion in a patent venue case. *See Arigna Tech. Ltd. v. Volkswagen AG*, Case No. 2:21-cv-00054-JRG-RSP, 2022 WL 2681012, at *3 (E.D. Tex. Jan. 18, 2022) (discussing collateral estoppel of venue challenge under § 1400(b) and determining that intervening precedent from the Federal Circuit prevented preclusion in that circumstance). Here, the Court is concerned that if it were to dismiss this case to permit Plaintiff to re-file elsewhere, Defendant may be collaterally estopped from raising a venue challenge based on similar evidence. *See Tatro v. Law Sch. Admission Council, Inc.*, Case No. CV 15-07627 RGK (JEMx), 2016 WL 11758786, at *3–4 (C.D. Cal. Jan. 26, 2016) (finding issue preclusion barred relitigation of venue in a different district because "the underlying issues of transfer of forum are identical" and the defendant relied on "nearly identical factors" in support of transfer). The Court thus concludes additional briefing on the issue of where venue may be laid, including where Defendant's allegedly infringing acts occurred, is necessary so this case can be transferred—though of course, the Parties are welcome to discuss with each other and reach agreement on the appropriate venue.

## IV    CONCLUSION

For the foregoing reasons, the Court GRANTS Defendant's motion pursuant to Federal Rule of Civil Procedure 12(b)(3). (Dkt. No. 22.) However, rather than dismissing this case, the Court ORDERS the Parties to submit supplemental briefing to address the question of where venue is proper under 28 U.S.C. § 1400(b) and *Cray*. Defendant SHALL file a brief, no more than 10 pages, identifying and presenting its position on where proper venue lies no later than

ORDER ON MOTION TO DISMISS FOR IMPROPER VENUE (DKT. NO. 22) - 21

**February 11, 2026**.  Plaintiff SHALL file a brief in response, no more than 10 pages, no later than **February 25, 2026**.

Dated this 28th day of January 2026.

David G. Estudillo
United States District Judge

ORDER ON MOTION TO DISMISS FOR IMPROPER VENUE (DKT. NO. 22) - 22